NO. 7633.

DANZIGER & TESSIER, IN LIQUIDATION

VS

CRABITES COMPANY, LIMITED.

STATE OF LOUISIANA.

COURT OF APPEAL

PARISH OF ORLEANS.

7633

84

By his Honor John St. Paul.

This is a claim for brokerage for alleged negotiating of a lease. Plaintiffs aver that they were employed by defendant to lease the premises No. 1033 Canal Street in the City of New Orleans, and did lease the same for a period extending from March 1st 1914 to February 28th 1919 (at $6000 per annum net); that there is due them by defendant, as compensation, $900 (being the customary commission of 3% on the net amount of the lease).

The answer "denies that plaintiffs were employed to lease said premises; denies that plaintiff did lease the said premises; and denies that there is due and owing to plaintiffs the sum of $900, or any sum whatever."

II.

The defense, as thus generally summed up in defendant's brief, is particularized in the testimony (in fine) of Mr.Baldwin, defendants Secretary, as follows:

> Question: Did you know that the transaction of making the lease was actually handled by Danziger & Tessier with Josiah Pearce & Sons, as testified to by Mr. Pearce?
>
> Answer: No; I did not so understand the situation. My understanding was that Judge Crabites had arranged the lease with Mr. Pearce, and that the subsequent drawing up of the lease was simply CLERICAL WORK, to put into shape the agreement entered into by Judge Crabites and Mr. Pearce, and which the Crabites Company had authorized by a resolution passed on the 7th of August 1913.
>
> x x x x
>
> Question: Did you know that Josiah Pearce & Sons had signed this agreement for renewal of the lease?
>
> Answer: No, I did not.
>
> Question: In fact you did not know of the existence of the document until it was produced in court; did you?
>
> Answer: I dont think I did. (All underscoring ours)

III.

The defense is still further particularized, and even amplified (without objection) by the testimony in Chief of Judge Crabites (here paragraphed and slightly abbreviated) as follows:

I reached New Orleans during the early days of June 1913, intending to sell my holdings (i. e. the holdings of the Crabites Company). The Grand Theatre, about which the present litigation has arisen, was under lease to Josiah Pearce & Sons for a term of years expiring in February 1914.

Previous to my arrival I had understood that Mr Pearce desired to take up the question of renewal. I got in touch with Pearce, and learned from him that he was willing to trade with me but desired a REDUCTION in rent. Knowing from this that I could have him for a tenant, if and when I desired, provided we could agree on terms, I felt very much reassured.

Returning (now) to the date of my arrival: I had learned that Danziger & Tessier had been commissioned by the Wolf Estate to take up negotiations with me looking towards the purchase of my holdings.

My relations with all the members of that firm were, and are still, of a pleasant character; (and) when I learned that Mr. Danziger could do nothing with the Wolfs (as their representative) I put this property in the hands of Danziger & Tessier to find a purchaser for me.

The best means of selling the property presented a series of difficult problems. I was not desirous of leasing to Pearce, because I was fearful that a long lease to him might hamper me in getting a sale. On the other hand I did not want to have Pearce get away from me; and I spoke freely and unreservedly to Mr. Danziger, the only member of the firm with whom I had these general relations.

As time drifted along, somewhere in the middle of July, or August, Pearce grew restless; he wanted to come to terms. I held him off as long as I could, telling him there was no real hurry. Finally he asked me several times to bring the matter to a head, and I then told Mr. Danziger that this lease to Pearce would have to come to a head in some form or another. (NOTE; The date of the final offer by Pearce, August 1st; its acceptance by Danziger & Tessier on August 6th; and the defendant's approval thereof on August 7th; show that JULY not August, was the correct date.)

It was (then) agreed between Mr. Danziger and me, in order to facilitate the sale of the property, to have (put) *him* in control of the property, (where) his relations with Pearce would be such that he could keep the Pearce matter in abeyance, without being forced to give Pearce a definite answer.

Finally, Mr. Danziger advised me sometime in the latter part of September (August?) that the POKORNY ESTATE had ripened into a genuine, bona fide prospect for selling the property to them. (NOTE; the reporter has actually written September, but that is manifestly an error. The month meant was ###### AUGUST for on August 25th the Pokorny deal fell through.)

He told me that the Pokornys wanted the property exclusively for investment purposes; that therefore it would be wise to CLOSE with Pearce, in order that he (Danziger) could offer Pokorny a bona fide investment upon bases of the rental. Later on he told me that Meyer Eisemann, representing the Pokornys, had actually agreed to buy at $125,000 (for all the property).

86

With the matter in that shape, and in order to cinch the Pokorny trade, which Danziger (Acting upon information received from Eisemann)considered closed, I told him to go ahead and close this deal with Pearce.

The Pokorny deal fell through, for reasons foreign to the present litigation; but this lease having been signed (closed?) upon the hypothesis that the Pokorny trade would go through, we were bound to Pearce, although the motive for our being bound (the Pokorny trade) had fallen.

The property was actually sold only six months later, through another real estate agent, to whom we paid his commission in full for the sale.

In other words, I considered, and I AM SATISFIED that Mr. ###### Danziger considered, that this lease was part and parcel of the sale of the property; that the lease was necessary to make the sale; and that otherwise I (having had all the preliminary conversations with Mr. Pearce) would have signed the lease myself, but allowed Danziger to COMPLETE it (only) as being part and parcel of the sale.

Question: Was there any agreement between you and Mr. Danziger as to his being paid a commission for negotiating this lease?

Answer: There was no specific arrangement of any kind. It was along these lines: (he said) "Let me handle Pearce; I am leasing him some other property, and we are in daily touch; I will have no trouble in avoiding a definite answer." And it was my understanding that as Mr. Danziger's commission on the sale, if it went through, would be around (above ) $3000, his work on the lease would not be charged against the Crabites Company.

Question: That was in the event he made a sale, there would be no commission charged for the lease? (Sic, as punctuated by the reporter.)

Answer: Understand me. Mr. Danziger did not say (so) to me in so many words. (Mr. Danziger not being present, and not apt to testify in this case, it is necessary that I should be perfectly fair to him.) He at no time said to me; "I will make you no charge for this lease", but it was my understanding and the whole basis of our conversation was, that the whole thing would go in globo, the commission on the sale being compensation for the whole thing; Danziger knowing that I could have closed with Pearce if I wanted to. And Danziger, knowing also, that I knew that the production of the "######" is one main stocks in trade of a real estate man; and that I had produced the prospective tenant and was in a position to close with him if I wanted. (All underscoring ours)

IV.

These occurences took place in the summer of 1913; and Judge Crabites gave his testimony in September 1916.

His cross-examination was long. It wrought no change in the substance of that given in chief; but from that source we gather the following additional facts, which we think pertinent:

**Question:** Have you the original lease?

**Answer:** Personally I have not. Since I left New Orleans, Mr. Baldwin has been my alter ego; I have none of my own papers on any matter; I have no papers at all.

x x x x x x

**Question:** You made quite a lengthy statement, and it was my understanding that you said that this agreement was made with Mr. Danziger upon the theory that the property was to be sold to the Pokorny Estate, and that he was to get his commission out of the sale and be entitled to none on this lease?

**Answer:** Yes; with this reservation; that the sale had ACTUALLY BEEN MADE, as I understood to the Pokornys already. You are probably not aware that the Pokorny people had led Mr. Danziger, and me, to believe that they had purchased the property; and subsequently we were surprised to learn, when the formal document was sent to us, (that) instead of purchasing the property, what they wanted was a four or five days option on the property. (The rest of the answer is only explanatory.)

x x x x x x x x x x x

**Question:** You are quite positive that you did not prior to that date (the date of the formal lease, August 30th) instruct Mr. Danziger to go ahead and make the lease with Pearce?

**Answer:** Undoubtedly prior to that date; for the reason that he (Danziger) told me, "The Pokornys want to buy, and our only chance of selling with them, is on an investment basis; I had been reluctant to close with Pearce, whom I had under my control to the extent that my (our) personal relations were good; and there was also the desire on my part of making the lease for a larger figure than the actual amount he was to pay, giving Mr. Pearce a cash rebate. But Danziger advised that the Pokornys were interested in the cash consideration for the lease, and nothing else; and that the lease should be made for the actual consideration (to be) paid, and no more. And the trade was THEN whipped into shape and CLOSED, Danziger believing, and so advising me, that it was necessary to cinch the Pokorny transaction.

x x x x x x x x x x

**Question:** You authorized Mr. Danziger to make the lease with Pearce for this period of time, and it was (is) just simply that you don't think you owe him any commission?

**Answer:** That is it; My understanding was (that) Mr. Danziger was to consider himself compensated by the $3500 or $3600, fee in putting through this sale; $3600 fees, particularly at that time of the year, were not things to be sneezed at.

**Question:** But you said you didn't make the assertion that Danziger ever so understood?

**Answer:** No, I don't say that. I mean Mr Danziger had never specifically told me that there would be no charge made. But he said "Let me handle this thing; this goes in one; this is part and parcel of handling the trade. I will handle the trade for you, and there will be no trouble about the lease." But he never, in so many words, told me that he would not charge a commission. But that was my understanding, and I

88

BELIEVE, if he were present, it would be his; or had he not seen the trade made by another real estate man, and the loss of his entire commission, I DON'T THINK there would ever have been a demand on as for this present sum of $900.

x x x x x x x x x x

Question: Were you aware of the fact that Josiah Pearce & Sons, #### under date of July 29th 1913, made a proposition to rent these premises through Danziger & Tessier at $5000 a year; and did you ever see the card which I now show you, signed by Josiah Pearce & Sons?

Answer: I knew the fact that Josiah Pearce & Sons, ## (put in touch with Danziger by me, for reasons heretofore given), had made an offer upon the property ### of $5000 per annum; and I also knew that Danziger was told not to close with them, and not to refuse; but to hold the matter in abeyance, for the reasons I have pointed out. x x x x x The date of this document, July 29th, and the subsequent date of the lease (August 30th ), show that the matter was not pressed.

Question: Did you not have presented to you by Mr. Danziger this proposition, dated July 29th, shortly after its execution?

Answer: I had knowledge of the issuance of that document practically contemporaneously with its issuance; but I don't recall having actually read it. But I knew from Danziger that Pearce had made an offer of $5000. As a matter of fact, I had reported to Danziger that, whereas the property was leased at $7500, and I was fearful that Pearce might not offer me more than $4000, I had seen enough of Pearce, in my interviews with him to know that I could trade with him AROUND FIVE THOUSAND, if I wanted to.

Question: Did you not forthwith instruct Danziger to DECLINE the $5000 Proposition?

Answer: I forthwith instructed Danziger to do absolutely nothing which would bring things to a head; but to use his own judgment as to the best way of keeping Pearce on the string, without binding us one way or the other.

Question: Then why did Pearce & Sons two days later, on August 1st, again submit a proposition; and this time for $6000, as shown from the back of this letter (card)?

Answer: I know nothing of the details between Mr. Danziger and Mr. Pearce; my mandate to Danziger having been to keep in touch with Pearce; not to let him get away, but not to close with him on any proposition.

Question: Did you not under date of, or prior to, August 6th 1913, instruct Danziger to accept the Pearce proposition?

Answer: I HAVE NO RECOLLECTION of ever instructing Danziger at any date to acquaint Mr. Pearce with any decision on my part. (NOTE; Baldwin's testimony above quoted, shows that on August 7th the defendant formally authorized a lease to Pearce on the same terms as those accepted by Danziger & Tessier on August 6th, as follows:)

Question: I show you the reverse of this document, and ask you if there is not a lead pencil offer there, from Josiah Pearce & Sons, of $6000; and if that is not dated August 1st; and if there is not an acceptance

thereof by Danziger & Tessier, dated August 6th.

89

Answer; There is such a condition of affairs there.

Question: How do you reconcile that with your statement that you were for a policy of delay, and did not want Mr. Pearce to be told one thing or the other?

Answer; I am NOT IN A POSITION TO ACCOUNT FOR THIS THING beyond what I told you. My sole desire in the premises was at all times to hold Pearce in shape. WE DID NOT KNOW how the Pearce lease was to be drawn up. THE QUESTION ~~arose~~ AROSE whether Pearce was not to make out the lease for a LARGER AMOUNT and receive a rebate in cash from us, to increase the purchasing power (selling value?) of the property. You see the DATE of the (formal) lease was actually considerably later than that. (NOTE; As heretofore said, the lease had been formally authorized by defendant as far back as August 7th, i. e. the day after its acceptance by Danziger & Tessier.)

Question: Was not the lease finally executed on August 30th, under your written instructions of August 28th, for the same consideration as mentioned in this document (on the reverse) of $6000 per annum?

Answer; (Yes,) SIX THOUSAND per annum; that is the figure mentioned here.

Question: Now did not Danziger & Tessier, or Danziger-whoever was handling this proposition-get them to agree to spend not less than $8000 in improvements on the premises during the term of the lease?

Answer; Such an agreement is incorporated in the lease. I don't know the exact amount; but it is around that.

    x x x x x x x x x x

Question; You have nothing outside of your recollection, to substantiate your idea that the firm of Danziger & Tessier should do the work in connection with the lease for nothing beyond the mere hope of earning the commission on the sale?

Answer; I have stated all the facts to you; (but) I have (also) this one fact, (You opened the door-); That Walter Danziger was desperately anxious to make money; that his subsequent career shows that a contingent fee of $3600, and more, meant a great deal to him. And he knew perfectly well that I could never bind myself for a fee of $900, when (as he knew) my tenure of the property was going to cease, as the result of my general financial condition, before the then existing lease expired. Mr. Danziger knew that I had absolutely no interest as a landlord in that property after the 1st of February 1914; that my sole desire was to put that property in such shape, during my stay in New Orleans, as would facilitate a sale thereof. (All underscoring ours)

V.

From the re-direct examination of the witness we extract the following, also pertinent we think, to wit;

Question; Prior to these negotiations for a renewal of this lease, had you had business dealings with Pearce?

Answer; Yes, Pearce had been my tenant for six years. x x x When I reached New Orleans Pearce called upon me, and it was clear from our interview that he was willing to trade. I should add that I was surprised that he was willing to trade upon AS LIBERAL A BASIS as what his preliminary

90

conversation with me developed. x x x I was (therefore) very much encouraged, and did not actually turn him over in any form whatever to Danziger until some months or so later, when the developments assumed a form where I thought it was fair for Danziger to handle the lease so that he might not be hampered in his negotiations (for a sale). x x x x In this matter the Crabites Company found the tenant; and Danziger & Tessier, with all due respect to them, their roll was to dangle him along and send him up when the Crabites Company wanted him.

x x x x x x x x x x

Question: Now, as far as the actual negotiations were concerned, this backing and filling between ###### Pearce and Crabites; that was conducted between you and Pearce, not between Pearce and Danziger?

Answer: No; outside of the original talk with Pearce, which showed me a photograph of his mind, I retired from the scene, knowing I had Pearce where I wanted I preferred not to see him because Pearce would have forced me, an owner, to answer; whereas Danziger ######## a real estate man, could "song and dance" him better. But Danziger's job was to do the backing and filling, and THAT IS ALL HE DID.

Question: At whose suggestion was this lease placed with Danziger, to do this fencing, you speak of, with Pearce?

Answer; I have thought of that and I AM NOT CLEAR. If I had known Danziger had made the suggestion, I would have stated so. But I believe it arose SPONTANEOUSLY from the nature of the case. x x x x Whether I told Danziger to do so and Danziger agreed, or whether Danziger suggested (it) to hold him off; I CANNOT RECALL, but it was born of the very nature of the negotiations; and a $3000 commission in those times, for a man harrassed by debt as Danziger was, was a lure which would bring any man on. (All underscoring ours)

VI.

On Saturday July 19th, Judge Crabites wrote Danziger as follows, the letter being on Club stationery, all in his own handwriting (and of course reserving no copy), to wit;

My dear Walter; I am going out of town to-morrow (Sunday) for the day, and may get back too late to see you Monday morning.

I have given our conversation of this evening considerable thought, and I am confident we can afford to risk a guarantee of five years at $7500 net, provided we get the price.

On a 6 1/2 % basis it means $115000, and on a 7% basis $107000, both well above what we can get with our March expiration scaring off purchasers.

I am prepared to TAKE MY CHANCES ON THE RENEWAL, and can afford to pocket a loss and still win.

Besides, if we can get an offer based on a long lease, it means a better price, and this better price will force THE ROSENTHALS to trade; as far as they are concerned we may decide to stand pat as to expiration. No injustice

91

is done the purchaser, because etc (the rest being irrelevant).

P. S. Why not write your CHICAGO INSTITUTION at once, laying the facts before it and asking a reply by wire if interested.

The "Chicago Institution" above mentioned had reference to "some trust funds belonging to a University; the University people having stated, so Danziger told me (Crabites), that they would be interested in New Orleans real estate on a 6% basis. This matter never developed at all."

The "Rosenthals" may, or may not, have been the same as the "Wolf Estate" mentioned in the testimony of Judge Crabites; but it is sure they are not (at lease there is no evidence to show, or even suggest, that they are) in any way connected with the "Pokorny Estate." De non apparentibus et non existentibus eadem est ratio. (All underscoring ours)

## VII.

On "Monday" Judge Crabites wrote Danziger as follows, the note being on a sheet of blank paper apparently detached from a scratch pad, and such as one person calling on another and finding him out, would dash off hurriedly on any handy scrap of paper and leave upon his desk, to wit;

Walter; While you are figuring with Pearce. (who by the way is in town) what do you think of the advisability of wiring CHICAGO a night letter enquiring as to whether or not they are interested.

This note bears no other date than "Monday"; which could not have been later than August 4th, since the negotiations with Pearce were finally closed on Wednesday August 6th; nor earlier than July 21st, the Monday mentioned in the letter of July 19th; which letter was probably the actual date, judging by the tenor of the of the note itself.

## VIII.

On Tuesday July 29th, Pearce addressed to Danziger & Tessier an offer to lease the property five years at $5000 net per year, and expend "over $8000 in improvements" during the lease.

92

On Friday August 1st, Pearce increased his offer to $6000 per year, less an allowance of one month's rent while the improvements were being made.

On Wednesday August 6th, Danziger & Tessier accepted the offer last mentioned.

On Thursday August 7th, the Crabites Company formally authorized a lease to Pearce upon the same terms as those secured by Danziger & Tessier.

IX.

On Tuesday August 26th, Meyer Eisemann (mentioned in the testimony of Judge Crabites) wrote Danziger, then at Hot Springs, Virginia, as follows (and part of the res gestae,);

> "I received your telegram this A. M. in response to the one from Crabites. Unfortunately, the deal has gone to pieces. Mr Crabites refused to give Pokorny until Monday September 1st, in which to close the deal; and result was that it was impossible to bring them to a compromise, although I made strenuous efforts to have the date fixed for Wednesday August 27th ( The rest is irrelevant)"

On Thursday August 28th, Judge Crabites wrote Danziger (at Hot Springs) as follows;

"The Pokorny trade has fallen thorugh for reasons outlined in the telegram sent you. x x x I have instructed your office to draw up the Pearce lease, and generally getc matters into proper shape for a continuance of our campaign (the rest is irrelevant)

X.

On Saturday August 30th, the formal lease between Pearce and the Crabites Company, and the rent notes to accompany the same, were duly drawn up and signed.

On the same day, Danziger & Tessier entered on their books a charge against the Crabites Company for the compensation herein claimed.

On December 5th, a deal for the sale of the property

to one Greco (an outsider) was closed through another real estate agent.

On December 6th, Danziger & Tessier sent their bill for services as herein claimed.

On December 22, the Crabites Company acknowledged receipt of the bill, with a statement that it had been forwarded, for information, to Judge Crabites then at Cairo, Egypt.

On December 23rd, Walter Danziger left the State; absconded; and has not been heard from since.

## XI.

From the testimony of Mr. Baldwin, Secretary of the defendant company, we further extract the following;

> "x x x x About the month of October 1913, I discussed with Mr. Danziger the plan of leaving him out of the proposition, so as to give another real estate man, who had approached me, an opportunity to see if a sale could be made. To this Mr. Danziger agreed; and after the other real estate man (Mr. Perrin) had failed to make a sale of the property, I then took up again with Mr. Danziger the question of selling the property. He failed to produce a buyer; and in November 1913, Mr. ####### Onorato took up with me the question of selling it; and I then made the agreement with Mr. Danziger that in case of a sale by Onorato, he (Danziger) would not participate in the commission. Mr. Onorato made the sale about the 5th of December 1913; that is, the #### deal was closed at that time, but the act of sale was not passed until about the 14th of January 1914. x x x."

## XII.

We mention the fact that a charge was entered on the books of Danziger & Tessier when the formal lease was signed (August 30TH) only because it so appears from the testimony; and the charge was doubtless made in due course of business. But plaintiffs can take nothing from this as showing the then state of mind of Danziger; since at that time Danziger was not in the City, but at Hot Springs, Virginia.

We likewise attach little weight to the statements of Mr. Tessier and his son, that they had no knowledge of any agreement to make no charge for the lease; since such an agreement might have been made and they not know it; and Danziger, as head of the

94

firm had ample authority to make such a contract (under the circumstances) if in fact he did so.

Nor do we attach any weight to the opinion of Mr. Tessier, that it would not have been "ethical" to make no charge for the lease. We have lately heard much of the Ethics of some new-born professions, the burden whereof being always (as it reaches us) that it would be "unethical" not to charge for this or that, or to charge less than so much or so much. That school of Ethics does not appeal to us, making a somewhat-too-litteral application of the aphorism, "Virtue brings its own reward"

We mention the fact that a bill for services was rendered the defendant in December 6th (the day after the closing of the deal put through by Onarato) merely to negative any too-rapidly drawn conclusion that Danziger intended at no time to make such a charge under any circumstances. For Danziger was in the city at that time, and must have had (did have) knowledge that the bill was sent.

And we mention Judge Crabites' reference to Danziger's financial embarrasment, not because it is legal evidence (the witness' own "you opened that door", being expressive of his own realization of that fact), but because it shows that the witness was himself sub-consciously influenced by subsequent events in his then appreciation of Danziger's intentions.

## XIII.

Now it needs but a casual glance over the evidence we have transcribed, to satisfy one that the connection of Danziger with the lease to Pearce, was not merely CLERICAL.

But the evidence goes farther; it shows that the roll of Danziger was not merely COMPLETE to what Judge Crabites had already agreed upon with Pearce.

Thus, When Judge Crabites reached New Orleans he found Pearce, who then paid $7500 net per annum, willing to renew but desirous of a REDUCTION in rent. He anticipated a claim for reduction to $4000; and was agreeably surprised to find that he could close

95

at any time with Pearce "on as liberal a basis" as ARABAND FIVE THOUSAND.

Judge Crabites then "retired from the scene" putting Danziger forward to do the "backing and filling" with Pearce; and thus matters stood until July 29th, on which day Pearce made an offer of $5000 rent, AND "over $8000 to be expended in improvements."

Judge Crabites "knew nothing of the details between Mr. Danziger and Mr. Pearce," but on August 1st Pearce increased his offer to $6000 rent (and $8000 improvements) less however ONE MONTH'S RENT ($500) whilst the improvements were being made. Which offer, on the very face, shows all the ear-marks of a proposition submitted as the result of serious negotiation.

Deduct $500 from $8000, leaving $7500; and divide by five. We then have, in improvements, the equivalent of $1500 per year added to the tenant's charge; and $6000 plus $1500 make $7500 per year, being the same amount as he was then paying. So that Pearce did not secure a REDUCTION in rent under the new lease. On contrary, as the remititure of rent was to be "whilst the improvements were being made," it is clear that the expenditure of $8000 was to be made in a lump sum; and as the tenant doubtless wished to enjoy those improvements, it is equally clear that this expenditure would be made at or before the commencement of the new lease; so that, interest on the advance considered, Pearce would actually pay, directly and indirectly, MORE RENT under his new lease than under the existing one.

It is true however, that the Net Cash to the landlord was $1500 less than under the existing lease; but nevertheless it was $1000 more than the "liberal basis" on which Judge Crabites could have closed "if he wanted to". And the landlord, whose property the improvements were to become, certainly derived some benefit from them; otherwise why stipulate for them?

It is also true that Judge Crabites could himself have conducted the negotiations with Pearce, had he chosen to do so; but then "Pearce would have forced me (Crabites), an owner, to to answer:" that is to say " somewhere in the middle of July", when Pearce became insistent, and when "I told Danziger that this lease

96

to Pearce would have to come to a head in some form or another"?
and probably on "as liberal a basis" as, AROUND FIVE THOUSAND, at
which "I could trade with him if I wanted to".

Be that as it may, the fact remains that Judge Crabites chose
*not* to conduct the negotiations himself, but to use Danziger; and
*Danziger* *did* render valuable service, not only by standing the brunt of the
"backing and filling", but also by negotiating a lease actually
more favorable to the landlord than the latter had any reason to
expect, or even hoped for.

### XIV.

As we have stated, the formal defense was, that Danziger had
not been employed and had rendered no real service; but this was
amplified by testimony received without objection; so that the
defense now is (substantially), that even if Danziger did render
some service, it was only in connection with, and as part of, his
efforts to effect a sale; and that all *his* services were to be
compensated only by the commission on the sale, should a sale be
effected by him, and not otherwise.

This is in effect a special defense, and the burden of proof
is on defendant. In a very similar case (Barker vs Jung, 13 Orleans
Appeals 280) we held that one who claims that a broker has waived
his commission for services rendered, must prove it. In that case
a broker, named Freret, had been employed by the defendant to sell
certain lots of ground. Freret in turn employed plaintiff; and
between them they interested one Cotton, but could not effect a
sale at once. Shortly afterwards the defendant himself sold the
lots to Cotton, and then refused to pay a commission to plaintiff,
who claimed the whole of it with the consent of Freret. We said
inter alia (p. 283)

> "It is contended by Jung that Freret renounced his
> right to a commission, and that therefore the plaintiff
> is not entitled to any. No one is presumed to give. The
> burden of proof was upon defendant, and he has not met
> it (C. C. 2232). A fair interpretation of Freret's
> testimony is, that he agreed to waive any commission

97

himself in order to protect Barker in his right to a commission. As Freret disclaims any right to the commission Barker is entitled to it."

And if we were to take the testimony of Judge Crabites, as defendant would have us do, to mean that Danziger, whatever the nature of his services in effecting the lease, agreed (in the hope of effecting a sale) to make no charge therefor under any circumstances; the, however unimpeachable the witness himself, yet his testimony is not of a nature to make proof of any such claim. For the witness swears to no such fact; he swears (at most) that such was his (the witness') understanding, and to his own belief, and being satsified, that it was also Danziger's; but he states categorically that Danziger made no such statement as to his (Danziger's) understanding of the matter. And there are also many things the witness cannot recollect, cannot recall, is not clear about, and cannot account for; so that on the whole, his testimony lacks that certainty required in the proofs of one who carries the burden of proof.

But we believe it a fair deduction from Judge Crabites testimony to say that the understanding appears to have extended no further (on the part of Danziger, at least) than, that there should be no additional charge for negotiating the lease, should Danziger effect a sale of the property; and that the commission on the sale (if effected by him) should be full compensation for all his services; and hence "there never would have been a demand on us (the defendant)" for a commission on the lease, had not Danziger seen the sale made by another broker and the consequent loss of that commission to him.

That appears to have been the deduction drawn from the testimony in chief of Judge Crabites by the counsel who represented the defendant when his testimony was taken; who, after hearing that testimony, and before the cross examination, put to the witness a question (heretofore quoted) in the form of an assertion that "in the event he (Danziger) made a sale, there would be no commission charged for the lease."

98

And such also appears to have been the deduction drawn from that testimony by the counsel who cross-examined him, as shown by his second question (as quoted above). To which Judge Crabites himself at once lent his assent, with this addition, that the sale to Pokorny appeared to have ACTUALLY BEEN MADE when his understand ing with Danziger was reached; and error of fact on his part, as we will presently show.

It is true that on his 15th, cross question (as quoted), the last but one of the cross examination, the last counsel attributes to Judge Crabites "an idea that Danziger & Tessier should do this work for nothing beyond the mere hope of earning the commission on the sale." But to this the judge answers only, "I have stated all the facts to you, " and then adds the remark about Danziger's "anxiety to make money"; a perfectly correct and concientious reply, but meaning only, that the counsel might draw his own conclusion, and that the witness then had (partly in the light of subsequent events) some such idea. But this is very far from an assertion that Danziger had exactly that same idea; an assertion which Judge Crabites had repeatedly refused to make.

## XV.

This case, however, does not rest entirely on the mere lack of any positive assertion by Judge Crabites that there was an understanding such as defendant now contends for. The Judge's evident (and expressed) wish to be perfectly fair to the absent Danziger, may perhaps have led him unconsciously into the opposite extreme of being somewhat less unfair to his own interests; and we would feel that we ourselves were not doing him full justice, were we not to point out what we believe to be the CRUX of the whole matter; and to which, under other circumstances, we would simply have ppinted at once, and gone no farther.

It is of course unhecessary to express the high esteem in which we (as well as all who know him) hold that distinguished gentleman. We accept without reserve, the testimony of Judge Crabites as being the truth, as he saw and felt it to be when he gave his testimony. But the most truthful witness (in fact the only truthful withess) is he whose testimony pictures faithfully

the state of his mind as it then is; and the frailty of human memory does therefore often lead the most sincere of witnesses into error.

Judge Crabites testified more than three years after the occurences themselves, and without papers of any kind in his possession or copies of his own hastily written letters; letters of which the defendant itself had no copies, or even knowledge. It was but natural therefore that he should have mistaken the actual course of events; which was as follows;

As early as July 19th, Judge Crabites (as his letter of that date shows) had determined to close the lease with Pearce; as late (at least) as July 21st (as show by the letter of July 19th and note dated Monday) he had in mind but two possible purchasers, the Rosenthals and the Chicago Institution; on August 6th the deal with Pearce was closed; Danziger ######### advised him "some time in the latter part of September," meaning August, that the Pokorny Estate had developed into a genuine prospect; the Pokorny deal fell through on Monday August 25th; and the formal lease to Pearce was signed on Saturday August 30th.

So that the lease to Pearce was certainly determined upon, and probably closed, ########before the Pokornys had even appeared on the scene; and Judge Crabites has simply confused, with the matter of negotiating with Pearce, his own discussions with Danziger (pending the negotiations with Pokorny) relative to, whether the formal lease should,## or should not, be made out for a larger nominal rent than the actual cash rental to be paid by the lessee; as is shown by his answers to the 3rd and 12th cross-questions (as quoted above).

Accordingly we think the able and learned District Judge has, on this occasion, erred ### his appreciation of the evidence; and thence we are constrained to disagree with his conclusions.

The judgment appealed from is therefore reversed; and it is now ordered that there be judgment in favor of the plaintiff, Danziger

& Tessier, In Liquidation, and against the defendant, Crabites &
Company, Limited, for the full sum of Nine hundred Dollars ($900.),
with legal interest from judicial demand and all costs of both
suits.

New Orleans La, January      1920

Rehearing refused Mch 8/20